IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 1, 2017

## IN RE TANYA G.[1]

**Appeal from the Juvenile Court for Knox County**
**No. 59186     Timothy E. Irwin, Judge**

_____

### No. E2016-02451-COA-R3-PT

_____

A mother's parental rights to her child were terminated on the ground of mental incompetence and upon the finding that termination was in the child's best interest. Mother appeals, contending that the ground is not supported by the evidence and that termination of her parental rights is not in the best interest of the child. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, LaToya G.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Jordan K. Crews, Assistant Attorney General; and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Christine L. Dummer, Knoxville, Tennessee, Guardian ad litem.

## OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

This is an appeal from the order terminating the parental rights of LaToya G. ("Mother") to her daughter, Tanya. The Department of Children's Services ("DCS") received custody of Tanya as a result of a proceeding DCS initiated in Knox County Juvenile Court on February 22, 2016, two days after Tanya's birth, to have Tanya

_____

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

declared dependent and neglected because of the state of Mother's mental health, which had resulted in Mother's involuntary commitment. After issuing a Protective Custody Order granting temporary legal custody of Tanya to DCS, a hearing was held, and the court found Tanya to be dependent and neglected; an Interim Order allowing DCS to retain custody of Tanya was entered.

On May 9, 2016, the court ratified a permanency plan and ordered that Mother be allowed supervised visitation with Tanya.[2] On October 20, 2016, DCS moved to suspend Mother's visitation due to Mother's inappropriate actions during visitation; the motion was granted. Of pertinence to the instant appeal, the Order noted:

> Ms. Capps testified that the mother would tell the child to shut up and would call her names such as "bitch," "whore," and "rat." The mother would also refuse any help during her visits despite the fact that the child would cry for so long that she would start to hyperventilate. The mother would also act erratically during the visits and is typically finished with the visits before the entire scheduled time has elapsed. The Court finds from all of the above that the mother's use of profanity towards the child during visitation is indicative of the mother's mental state and the mother's refusal to allow the workers present at the visit to assist with the child is indicative of the mother's [in]stability.

The instant case was initiated on March 2, 2016, when DCS filed a petition to terminate Mother's parental rights on the ground of mental incompetence; the petition alleged:

> 1. Respondent is incompetent to adequately provide for the further care and supervision of the child because Respondent's mental condition is presently so impaired and is so likely to remain so that it is unlikely that she will be able to assume the care of and responsibility for the child in the near future.
>
> 2. Tanya [G.] is the fifth child to be removed from Respondent's custody due to her mental condition. Following hearings that concluded on November 1, 2006, this Court found Respondent incompetent to parent and terminated her parental rights to two older half-siblings, []. Her parental rights to [] were terminated several years later on similar grounds. [] was placed in the custody of his paternal grandparents. Respondent's mental condition has not improved in any regard, and there is no reason to believe that she will ever be in a position to safely care for children.

---

[2] The permanency plan was not included in the record on appeal, but at trial, DCS Family Services Worker Sadie Capps testified that the plan required Mother to complete a mental health assessment and follow all recommendations; complete an alcohol and drug assessment and follow all recommendations; have appropriate housing; have appropriate income; pay child support; and be a law-abiding citizen.

3. Respondent gave birth to Tanya [G.] in a toilet at home and yelled for help from her boyfriend, James [O.]. They fished the baby out and then dropped her because she was slippery. They were brought to the hospital by ambulance. Respondent reported she had not known she was pregnant and Mr. O[.] agreed. He stated that he had taken her in off the street about three months before. She had received no prenatal care and had not been taking any prescribed psychotropic medication at least since he took her in. Respondent appeared confused, agitated, and delusional.

4. A psychiatric consultation resulted in Respondent's involuntary commitment. The evaluator noted that Respondent has a long history of mental illness including repeated emergency room treatment. She had been found on somebody's porch, had claimed twice to have been kidnapped, and on another occasion was found walking down the street without clothing. Her mental status examination concluded: "She is paranoid, disorganized, and irritable. Her conversation is loose. She contradicts herself. She has been talking to unseen others. She appeared to have chronic untreated mental illness. Her memory and concentration are poor. Her insight and judgment are currently impaired." The diagnostic assessment was Schizophrenia, untreated; currently delusional.

5. Respondent's history includes repeated hospitalizations and multiple psychological evaluations. According to such an evaluation in 2007, her "mental illness is severe, persistent and causing her to lack capacity/competence to understand facts and to make rational decisions based upon such facts." She has failed and refused to cooperate with treatment. She is often paranoid, easily angered, and her behavior is unpredictable.

The termination hearing took place on November 14, 2016. On December 6 the court issued an order terminating Mother's parental rights.

Mother filed her first Notice of Appeal on November 28, 2016, which was not signed by either Mother or her counsel. On February 7, 2017, this Court ordered Mother to file an amended notice of appeal; the trial court appointed appellate counsel for Mother, and an amended Notice of Appeal was filed on February 23, 2017. Mother presents the following issues for resolution:

I. Did the trial court err in finding by clear and convincing evidence, that the Mother was incompetent to adequately provide for the further care and supervision of the child because the Mother's mental condition was so impaired and was likely to remain impaired so that it is unlikely that the Mother may assume or resume the care and responsibility for the minor

child as defined by Tennessee Code Annotated section 36-1-113(g)(8)(B)(i)?

II. Did the trial court err in finding by clear and convincing evidence, that termination of the parental rights of the Mother was in the best interest of the child as defined by Tennessee Code Annotated section 36-1-113(i)?

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated under certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Servs. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). However, because of the fundamental nature of parental rights, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766-69. A court may terminate parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence, and (2) it is shown by clear and convincing evidence that termination of parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

In light of the heightened standard of proof required, an appellate court must adapt the customary standard of review set forth by Rule 13(d) of the Tennessee Rules of Appellate Procedure. *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise, in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure. *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* Clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence," which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## III. ANALYSIS

### A. JURISDICTION

We first address DCS' argument that the notice of appeal filed by Mother was "jurisdictionally deficient" because it was not signed by Mother, in violation of Tennessee Code Annotated section 36-1-124(d), or by her counsel, as required by Tennessee Rule of Civil Procedure 11.01(a), and that, because of this deficiency, the

notice filed February 23, 2017, was untimely.  We decline to dismiss this appeal on the basis urged.

The technical record contains a form headed "IN THE JUVENILE COURT FOR KNOX COUNTY, TENNESSEE" and entitled "NOTICE OF APPEAL," in which Mother's name is handwritten as the party taking the appeal and the name of this Court circled as the court to which the appeal is taken.  The date of signature is written in as "the 28 day of November, 2016" and the form bears the Clerk's stamp as being filed at 10:19 a.m. on November 28, 2016.  Next in the record appear two orders entered by the Juvenile Court on December 6, both of which reference a hearing on November 14; the first order was entered in the dependent and neglect proceeding and the second being the order terminating Mother's rights.  Tennessee Rule of Appellate Procedure 4(d) allows that "a prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof."  Thus, subject to DCS' contention that the November 28 notice was not signed, the notice was timely filed.

The termination proceeding was initiated on March 2, 2016; Attorney Adam Moncier was appointed to represent Mother by order entered April 19;[3] there is no order relieving Mr. Moncier of his duties as counsel.  The record does not reflect any other involvement by Mr. Moncier after the adjournment of the November 14 hearing.  It is not disputed that Mother filled out and signed the form "NOTICE OF APPEAL" indicating a desire to have the termination of her rights reviewed.  Under the circumstances presented, Mother's handwritten name in the blank space designated for the name of the person taking the appeal complies with Tennessee Code Annotated section 36-1-124(d).

B. TERMINATION ON THE GROUND OF MENTAL INCOMPETENCE

A parent's rights may be terminated on the ground of mental incompetence if the court determines, by clear and convincing evidence, that the parent's mental condition is impaired to such a degree that the parent cannot adequately provide care and supervision to the child, and it is unlikely that the parent will be able to do so in the near future.  *See* Tenn. Code Ann. § 36-1-113(g)(8)(B).[4]  The burden is on DCS to demonstrate two

---

[3] As noted in the petition to terminate Mother's rights, DCS had filed a dependent and neglect proceeding regarding Tanya on February 22, 2016.  Although the record before us does not include the record of the dependent and neglect proceeding, it appears that Attorney Moncier was appointed to represent Mother in that proceeding as well.

[4] Tennessee Code Annotated section 36-1-113(g)(8) provides:

> (A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

5

essential facts: (1) that the parent is presently unable to care for the subject children, and (2) that the parent is unlikely to be able to care for the children in the near future. Tenn. Code Ann. § 36-1-113(g)(8).

In this case, the court held that Mother was "incompetent to adequately provide for the further care and supervision of the child because her mental condition is presently so impaired and is so likely to remain so that it is unlikely that she will be able to assume or resume the care of and responsibility for the child in the near future." The court further stated:

> 10. . . . The Court is not confident that the mother can protect herself from danger much less the child. Despite the mother's brief lucid moments, the Court has no confidence that the mother could deal with the child when sick, make a bottle for the child, or keep supplies for the child in the home. The mother's behaviors are consistent with her past behaviors when her four older children were removed from her custody and when her parental rights were terminated as to three of them.

Mother contends that the finding of mental incompetency is not supported by the evidence; that DCS relied on her past dealings with DCS, rather than providing recent or current evidence; that her past mental health deficiencies are not indicative of her abilities once her medication has been regulated; and that DCS failed to introduce clear and convincing evidence that Mother could not, if properly treated, resume the responsibilities of parenting Tanya.

---

> (B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
>
>> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
>>
>> (ii) That termination of parental or guardian rights is in the best interest of the child;
>
> (C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

6

Dr. James Murray, a licensed clinical psychologist who evaluated Mother at the request of DCS and Mother's attorney, testified at trial relative to Mother's medical history and his observations during his evaluation of her, and gave opinions as to her condition and ability to parent Tanya. He noted that Mother's records identified at least six involuntary commitments or hospitalizations between 2005 and 2016 and contact with the mobile crisis unit on at least six occasions between 2005 and 2008. He also noted that Mother had been diagnosed with a psychosis NOS, which he testified is a diagnosis indicating that a patient is "psychotic," but that symptoms do not "fit[] any pattern." Dr. Murray provided lengthy testimony as to Mother's diagnoses and treatment:

> She has also received a diagnosis for schizoaffective disorder, which the diagnosis requires all the diagnostic features of both schizophrenia and bipolar disorder. So you meet all the criteria for both of those, and you're displaying both of those sets of symptoms within a short period of time or alternating between them where they can document that you have had them at one time or another, as well as various types of substance dependence diagnoses.

> Typically her treatment regimen consists of medication for psychotic disturbance and thinking, for depression and for affective lability, that is, poor control over emotions, as well as poor behavioral control. Those are the consistent centralized target symptoms.

> She is typically seen in the hospitalizations as stabilizing when she is placed on medication within an enclosed psychiatric facility and with inpatient supports, but she is hostile and rejecting when outpatient follow-up is addressed as part of her discharge plan.

> While she appears willing to accept psychotropic medication when hospitalized, the records and statements indicate she universally rejects medication and other treatment supports once she is out of the hospital. This seems to be a very consistent and discouraging pattern.

> ***

> The other records we reviewed involved [the] mobile crises unit, identifying crises situations in which she is reported to be off her medication, likely to be abusing drugs or alcohol, or psychotic in her thinking or behavior. There were records from eight contacts from June 2000 to February 2016. In all of these cases she is described as acutely psychotic, bizarre and grossly psychotic in her behavior, for example, nude in public or having just delivered a baby in her back yard, thought disorder, that is, the kind of disturbance in thinking, delusions, hallucinations, poor reality testing characteristic of psychosis. She is hostile or disorganized,

delusional, uncooperative and apparently unmedicated, and in most of these cases the follow-up is for her to be hospitalized.

Additionally, Dr. Murray testified that Mother's diagnosis reflects "very severe impairments in functioning across the wide range of normal adult responsibilities." He stated:

[T]he records reflect that she fails to take care of herself in a responsible fashion, that she is often out of touch with reality, not truthful or cooperative with outside support resources or treatment resources, that she can complicate whatever psychiatric difficulties that she's having or lack of medication or even effective medication with substance abuse, and that she frequently is capable of very unrealistic or impaired reality testing, that perceptions and reasoning and judgment are often grossly compromised, and that she often fails to act in her own best interest.

During his examination of her, Dr. Murray noted that Mother's statements were "peculiar and inconsistent with other records," and observed:

Mother exhibited periods of both slow down and rapid speech. She was at times hypervigilant, kind of hyper alert, paranoid like, and even when she was completely denying any problems, she looked apprehensive and very distressed. Attempts by the examiner to encourage further responding clarifications or attempts to have her respond appropriately to questions or materials, typically produced angry or explosive outbursts.

Her mood could rapidly change from anxious, indifferent, invasive and withdrawn to agitated, hostile, violent, and threatening. She denied any past or present symptoms of depression, anxiety, psychosis and alcohol or drug abuse. She denied any suicidal ideation or intent or acts in the past or present.

When asked to account for differences between her accounts and records the examiner had reviewed, she became highly agitated, hostile, tangential, illogical, paranoid and bizarre, making references to herself as being Jesus Christ and being persecuted.

\*\*\*

When asked about children, she stated that she has no children and has never had any children.

\*\*\*

Dr. Murray gave his opinion as to Mother's mental condition:

8

The mother shows chronic, severe mental health problems, they are recurrent, and she displays a recurrent pattern of failing to treat or accept treatment for them. They are the kind of severe and potentially chronic mental health problems that are identified by experts as grossly compromising the ability to function in important areas across a wide range of normal adult behaviors, and are also identified as high risk factors for problematic parenting and inducing psychological problems or risks for the children.

When questioned by Mother's counsel at trial about a patient's ability to parent and cope with schizophrenia, Dr. Murray explained that a person with schizophrenia may be able to parent if she has internal resources, which he referred to as "overall adaptive resources," which he explained may include a high IQ, long periods of time when the patient is functioning and not "overtly schizophrenic," and a favorable response to and ability to maintain treatment.

Based on Mother's history and his observation of her, Dr. Murray testified that he does not believe Mother has the resources necessary to successfully parent. When asked by the court whether "it is safe for [Mother] to be a parent in the state she was in," Dr. Murray responded, "[N]o, she was overtly psychotic and impaired in reality testing and her judgment, as it appeared to me, seems substantially impaired." Of particular significance to our consideration of this ground for termination is the following question from the court and Dr. Murray's response:

THE COURT: Do you have any idea within scientific reason as to the time involved for her to recover to a point, if she could even recover, to a point where she could be a fit parent; do you have an estimate of treatment time that would take? If not, just tell me no.

THE WITNESS: I would hold it into two elements. The first is for her to accept and take treatment sufficient for a determination to be made about how much gain she makes, okay. If, for example, she is on appropriate medication for psychosis, how long do you have to be on that medication until you have a dosage level and it's working, for you to have some sense of okay, this is where we're at when she's on the medication.

The second is cooperation, she is not decidedly resistant. What we don't have in this case that would help me answer that is, when she was cooperative with A, a period of time when she was cooperative with treatment, how far did she go and how long did it last? The best particular future success is past success. She hasn't had success with treatment, and it's identified by the treatment providers that a significant portion of that, if not the determinative portion of that, was her lack of cooperation with treatment.

9

THE COURT: Do you anticipate that she has the ability to recover in the near future and parent again; do you have an anticipation that have or –

THE WITNESS: I'd rather not -- I don't have any anticipation that she is likely to be cooperative with treatment, period.

Sadie Capps, Family Services Worker for DCS, also testified at trial. Ms. Capps testified that Mother's parental rights to three older children were terminated on the ground of mental incompetence, and a fourth child is in the custody of the child's paternal grandmother.[5] Ms. Capps stated that Mother did complete the mental health assessment required by the permanency plan, but Ms. Capps had not seen proof of compliance with recommendations of that assessment. Regarding her interactions with Mother during supervised visitation with Tanya, Ms. Capps testified:

During the visits she is very -- she will not follow recommendations at all. At times the baby's been crying, and the mother refuses to give the baby the pacifier, feed the baby, burp the baby, whatever I recommend, she generally refused to do that. There's been a time that she held the baby against her chest and pressed the baby against the wall after the visit had ended, and I was trying to get Tanya from her.

She is usually dressed inappropriately, takes clothing off during the visit and exposes herself. The last visit that she had, the baby was crying a lot. I requested that she do several different things to help the baby calm down. She refused. The baby started making herself sick, she was crying so much. So I told the mother that the visit was going to have to be over if she wouldn't follow recommendations, and it took three caseworkers to get the baby from the mother.

Ms. Capps stated that it was at that point that DCS moved to suspend Mother's visits, which was approved by the court in October 2016.

The testimony of Dr. Murray and Ms. Capps is clear and convincing evidence in support of the trial court's finding that Mother is mentally incompetent to care for Tanya, and that, due to the nature of her impairment, it is unlikely that she could reach the necessary level of competence to resume her care. Dr. Murray's diagnosis of Mother's untreated schizophrenia and his opinion as to her competency to parent in light of that diagnosis are unrebutted, as is Mother's documented behavior. The ground of mental incompetence is fully established by the evidence.

---

[5] Mother's parental rights to these children are not at issue in this case.

## C. BEST INTEREST

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. Tennessee Code Annotated section 36-1-113(i) sets forth a list of factors to guide the courts in determining the child's best interest.[6] This list of factors "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue, we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interest[] in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the

---

[6] Tennessee Code Annotated section 36-1-113(i) provides:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

The trial court made the following findings regarding whether termination is in Tanya's best interest:

1. . . . Respondent has failed to make such an adjustment of circumstance, conduct or conditions as to make it safe and in the child's best interest to be in her home after reasonable efforts by the Department of Children's Services for such duration of time that lasting adjustment does not reasonably appear possible. The mother has failed to appear for any medication assessment despite the Department of Children's Services efforts to assist her with scheduling such an appointment. The mother's behaviors have remained consistent throughout the child's time in foster care and are consistent with the mother's behaviors when her older children were in foster care.

2. Tanya [G.] is entitled to a safe, secure and loving home and is in a prospective adoptive placement.

3. The Department of Children's Services has made reasonable efforts toward achieving permanency for this child.

Mother argues that the evidence does not support the court's holding that termination of her rights is in the best interest of Tanya.[7]

Contrary to Mother's argument, the evidence supporting the holding that termination of her rights is in Tanya's best interest is clear and convincing. In addition to the testimony of Dr. Murray and Ms. Capps, quoted above, Tanya's foster mother testified that Tanya has extensive medical needs which are being met in her placement.[8]

---

[7] Mother argues that the holding is based "only on the foster mother's testimony that her home is pre-adoptive."

[8] Foster mother testified as follows with regard to Tanya's particular needs:

Q. To your home, okay. How is she doing?
A. She's doing well.
Q. Any follow-ups, any medical follow-ups, she's needing other than routine care?
A. She sees an infectious disease doctor for her HIV testing, and she sees a GI specialist for her GI issues she has.
Q. Has she been diagnosed with HIV at this point?

12

According to the opinion of Dr. Murray, Mother is not capable of meeting these needs. The foster mother also testified their family is composed of her husband and four children other than Tanya, that Tanya is doing well in foster care, and that the foster parents intend to adopt her.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the trial court terminating Mother's parental rights is AFFIRMED.

_____
RICHARD H. DINKINS, JUDGE

---

A.    No.

Q.    Do you know how many more times she'll be tested for that?

A.    She needs to be tested again at 18 months. So far all of the tests have been negative.

. . .

Q.    What are her GI problems?

A.    She has a lot of acid reflux problems, and she spits up a lot.

Q.    Are those getting better?

A.    No. We're actually going to try another GI doctor tomorrow to see if they can figure it out.

Q.    But otherwise she's happy, healthy?

A.    Yes.

Q.    Are you a forever home for her if that becomes an option?

A.    Yes.